<p style="text-align:center; color:red">**CORRECTED**</p>

# In the United States Court of Federal Claims

<p style="text-align:center">No. 21-1664<br>Filed: May 30, 2024</p>

| | |
|---|---|
| THE CONFEDERATED TRIBES OF THE COLVILLE RESERVATION, | ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| *Defendant.* | ) ) ) |

*Brian William Chestnut*, Ziontz Chestnut Law Firm, Seattle, Washington, with whom were *Wyatt Golding*, Ziontz Chestnut Law Firm, Seattle, Washington, and *Brian Gunn*, Powers Pyles Sutter & Verville PC, Washington, DC, of counsel, for Plaintiff.

*Devon Lehmam McCune*, United States Department of Justice, Environment & Natural Resources Division, Natural Resources Section, Denver, CO, and *Todd Kim*, Assistant Attorney General, United States Department of Justice, Environment & Natural Resources Division, Washington D.C., with whom were *Dondrae Maiden*, *Kristen Kokinos*, *Michael Bianco*, and *Robert J. Merritt*, United States Department of the Interior, Office of the Solicitor, Indian Trust Litigation Office, of counsel, for Defendant.

## OPINION AND ORDER

**MEYERS, Judge**.

In 2015, massive fires burned through Colville Reservation's forest lands held in trust by the United States, burning roughly 165,000 acres. Put another way, the fires destroyed approximately 800 million board feet of commercial timber that the Plaintiff relies upon for its fiscal wellbeing. The fires were so hot that they sterilized the soil and left a once productive forest looking like a moonscape. The Confederated Tribes of the Colville Reservation seek compensation for these and subsequent losses from the United States, alleging a breach of the Government's fiduciary duties.

To bring such a claim in this court, Plaintiff must establish that there is a money-mandating source of law that entitles it to compensation. In *United States v. Mitchell*, 463 U.S. 206, 224 (1983) (*Mitchell II*), the Supreme Court held that the statutory trust relationship between Indian tribes and the United States regarding forest lands included certain fiduciary duties related to the management of the forests and the sale of their timber that are money-

mandating.  This case asks whether there are also fiduciary duties to protect the forest from fires, suppress fires once they start, and to regenerate the forest after the fires.  The statutory and regulatory regime that has evolved over decades demonstrates the existence of such duties.  Therefore, the Plaintiff has established this court's jurisdiction, and the court does not dismiss for lack of specific fiduciary duties.

The Government also argues that certain claims are untimely under this court's six-year statute of limitations.  Here, the court agrees that claims that accrued more than six years before the Plaintiff's filing its complaint are barred.  But it is not clear on the present record that any claims are barred.  While the Government insists that Plaintiff is seeking to recover for breaches that occurred long ago, Plaintiff also seeks damages for alleged breaches within the statute of limitations.  To resolve the dispute of what portions of Plaintiff's claims are barred by the statute of limitations, the court will need a much fuller record before it.  For example, Plaintiff alleges there were breaches of a duty to thin the forest.  There were breaches outside the statute of limitations and others within it.  Which ones caused the alleged damages?  This court cannot say with the limited record before it on a motion to dismiss.  That will need to be resolved another day.

Finally, the Government seeks to dismiss any claim based on violations released by a prior settlement agreement.  To resolve prior trust management disputes, the parties entered into a settlement agreement that released all claims, known or unknown, based on breaches or harms that occurred prior to the effective date of the agreement.  Given the agreement's language, the court agrees that claims based on alleged breaches that pre-dated the effective date of the settlement agreement are barred by it.  Like with the statute of limitations, however, the court will need a much fuller record to determine whether Plaintiff's claimed harms are based on pre-settlement agreement breaches.

Therefore, the court grants-in-part and denies-in-part the Government's motion to dismiss.

## I.  **BACKGROUND**

The Confederated Tribes of the Colville Reservation "is a federally recognized Indian tribe" that occupies "the Colville Reservation in eastern Washington."  ECF No. 1 ¶ 8.  The Colville Reservation was established in 1872.  *Id.* ¶ 15.  As established, the Colville Reservation "consisted of all lands within Washington Territory bounded by the Columbia and Okanogan Rivers, extending northward to the U.S.-Canadian border and encompassed approximately three million acres."  *Id.*  Forest land accounts for "almost two-thirds" of the Colville Reservation, where "[o]pen rangeland and forested rangeland account for almost one-third," and residential, land, agricultural land, and surface water make up the remainder.  *Id.* ¶ 16.  The Confederated Tribes rely on their forest lands and resources—which include "approximately 652,308 acres" of commercial forests—"to generate revenue for the Tribes, to provide employment for Tribal members, to provide cultural and natural benefits, and to serve as a self-sustaining permanent homeland."  *Id.* ¶¶ 18-19.

In 1990, Congress enacted the National Indian Forest Resources Management Act (NIFRMA) which "required the Secretary of the Interior to obtain periodic independent

assessments 'of Indian forest lands and Indian forest land management practices.'"  *Id.* ¶ 37 (quoting 25 U.S.C. § 3111(b)).  Pursuant to the statute, the Indian Forest Management Assessment Team ("IFMAT"), a team of independent forestry experts, prepared reports in 1993, 2003 and 2013, all of which "included visits to and review of the Colville Reservation."  ECF No. 1 ¶¶ 37-38.  Each IFMAT report found that "the United States failed to fulfill its trust obligations to Indian forestry generally."  *Id.* ¶ 37.  The 2013 report "specifically identified the well-known and growing threat of catastrophic fire resulting from inadequate fuel reduction and forest management."  *Id.* ¶ 40.  It stated "[t]he health of tribal forests is threatened by density-related issues such as wildland fire . . . This is especially the case in the dry West where much of Indian forest acreage is" and the report warned "[i]f land managers are going to use fire as a tool to restore ecosystems and reduce landscape level fuel accumulations, they need to be treating five to ten times the amount of acres they have been treating annually over the last decade."  *Id.* ¶ 40 (citing IFMAT-III at Vol. I, p. 6).

The North Star fire started right next to the Colville Reservation in August 2015 and lasted until October 2015, burning 165,000 acres on the Colville Reservation.  ECF No. 1 ¶¶ 48-56.  The Tunk Block fire started in August 2015 and burned "approximately 165,947 acres" of the Colville Reservation.  *Id.* ¶ 57.  These two 2015 fires "burned . . . more than 800,000,000 board feet of [Plaintiff]'s valuable commercial timber."  *Id.* ¶ 58.  And since these fires, other "high intensity fires" have started on the Colville Reservation and further damaged the land's resources.  *Id.* ¶ 59.

In December 2005, the Plaintiff filed a separate "suit in the U.S. District Court for the District of Columbia alleging that the United States breached its fiduciary related to [the Plaintiff's] monetary and non-monetary trust assets and resources."  ECF No. 7 at 5 (citing *Confederated Tribes of the Colville Rsrv. v. Salazar, et al.*, No. 05-cv-02471 (D.D.C. 2005), ECF No. 1).  The Plaintiff and the Government settled in 2012 and the district court "entered the Joint Stipulation of Dismissal with Prejudice on September 28, 2012.  In exchange for $193 million dollars, [the Plaintiff] agreed to a broad waiver and release of claims."  *Id.* at 6.

The Government moves to dismiss the complaint pursuant to Rules of the Court of Federal Claims ("RCFC") 12(b)(1) and 12(b)(6).

## I.   This court has jurisdiction to decide Plaintiff's claims.

When deciding a RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor.  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  The plaintiff bears the burden of establishing subject matter jurisdiction and must do so by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  If the court determines that "it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); RCFC 12(h)(3).

The Tucker Act grants "the Court of Federal Claims jurisdiction to award damages upon proof of 'any claim against the United States founded either upon the Constitution, or any Act of Congress . . .'"  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003)

3

(quoting 28 U.S.C. § 1491(a)(1)).  "[I]ts companion statute, the Indian Tucker Act, confers a like waiver [of sovereign immunity] for Indian tribal claims that 'otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe . . .'" *Id.* (quoting 28 U.S.C. § 1505).  That said, "[n]either the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law . . . ." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (*Navajo II*) (citation omitted).  Thus, to establish jurisdiction under the Indian Tucker Act, a plaintiff "must assert a claim [for money damages] arising out of other sources of law . . . ." *Hopi Tribe v. United States*, 782 F.3d 662, 666 (Fed. Cir. 2015).  The existence of a money-mandating fiduciary duty can meet this requirement.

The Supreme Court has laid the groundwork for determining whether a law creates a money-mandating fiduciary duty to an Indian tribe that can establish jurisdiction under the Indian Tucker Act.  In the seminal *Mitchell* Cases, the Court made clear that to establish jurisdiction, the plaintiff must demonstrate the law imposes a specific, unambiguous duty upon the Government rather than a limited or general duty.  *United States v. Mitchell*, 445 U.S. 535, 542 (1980) (*Mitchell I*).  And the plaintiff must show that the "law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained."  *Mitchell II*, 463 U.S. at 218.  In *Navajo I*, the Court emphasized that "[a general trust] relationship alone is insufficient to support jurisdiction under the Indian Tucker Act.  Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions" and explained "[t]hose prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred."  *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) (*Navajo I*).

In *Navajo II*, the Supreme Court "established a two-part test for determining jurisdiction under the Indian Tucker Act" incorporating the *Mitchell* cases and *Navajo I*.  *Hopi Tribe*, 782 F.3d at 667.  This remains the current standard.  For step one, the plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties," and allege the Government violated those duties.  *Navajo II*, 556 U.S. at 290.  Under step one, "[t]o establish that the United States has accepted a particular fiduciary duty, an Indian tribe must identify statutes or regulations that both impose a specific obligation . . . and 'bear[ ] the hallmarks of a conventional fiduciary relationship.'"  *Hopi Tribe*, 782 F.3d at 667 (citing *Navajo II*, 556 U.S. at 301).  "Such duties often arise when the government has 'comprehensive control' over the trust's corpus."  *Confederated Tribes & Bands of the Yakama Nation v. United States*, 153 Fed. Cl. 676, 694 (2021) (citing *White Mountain Apache Tribe*, 537 U.S. at 475).  That said, "[t]he Federal Government's liability cannot be premised on control alone."  *Navajo II*, 556 U.S. at 301.  And "[t]he Government's common law trust obligations *alone* cannot satisfy the first part of the analysis."  *White Mountain Apache Tribe v. United States*, 157 Fed. Cl. 303, 309 (2021) (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011) (additional citation omitted) (emphasis added).

When the statutory language provides for a broad trust relationship over a particular asset and identifies specific fiduciary responsibilities regarding that asset, duties that are necessary to comply with the specific statutory responsibility may be inferred.  *Hopi Tribe*, 782 F.3d at 668 (citing *White Mountain Apache Tribe*, 537 U.S. at 475).  Duties to protect and preserve a trust asset may also be inferred in these cases where the fiduciary relationship goes beyond a bare

trust and bears the hallmarks of a more conventional fiduciary relationship. *Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353, 1368 (Fed. Cir. 2024); *White Mountain Apache Tribe,* 537 U.S. at 475. As the Federal Circuit recently explained: "By identifying a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property, the [statute at issue] bears the hallmarks of a more conventional fiduciary relationship." *Ute Indian Tribe,* 99 F.4th at 1368 (cleaned up). And when a statute "like the statute at issue in *White Mountain Apache* . . . goes beyond a bare trust" it "permits a fair inference that the Government is subject to duties as a trustee to protect and preserve the property." *Id.* (cleaned up).

For *Navajo II* step two, the claimant must show the "source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties" the source of law imposes on the Federal Government. *Navajo II*, 556 U.S. at 291 (cleaned up). "A statute is money-mandating . . . when (1) 'it can fairly be interpreted as mandating compensation by the Federal Government . . .' or (2) 'it grants the claimant a right to recover damages either expressly or by implication.'" *White Mountain Apache Tribe*, 157 Fed. Cl. at 310 (quoting *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017)). It is at this step that "common-law trust principles . . . (including any such principles premised on 'control') could play a role in inferring that the trust obligation [is] enforceable by damages." *Hopi Tribe*, 782 F.3d at 668 (cleaned up). And "the Supreme Court has stated that when a statute establishes specific fiduciary obligations, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for breaches of trust." *Id.*

The Government argues this court lacks subject matter jurisdiction because the Plaintiff failed to establish a waiver of sovereign immunity for its claims relating to the North Star and Tunk Block fires. ECF No. 7 at 12-27; ECF No. 14 at 2-12. Specifically, the Government alleges the Plaintiff failed to identify a substantive source of law which "establish[es] specific fiduciary duties, money-mandating in breach, related to forest management and fire prevention, [or] to the maintenance of the roads at issue in this suit." ECF No. 7 at 12. The Plaintiff counters that "25 U.S.C. §§ 406 and 407, 25 U.S.C. § 5109, the National Indian Forest [Resources] Management Act (NIFRMA), 25 U.S.C. § 3101 *et seq.*, and associated regulations [are] the source of specific, money-mandating duties." ECF No. 11 at 9; *see also id.* at 14 ("the Tribes rely on . . . 25 U.S.C. §§ 406(a), 406, 407, 25 U.S.C. § 5109 . . . 25 U.S.C. § 318a, and 25 C.F.R. part 163."). And these statutory duties, which, according to the Plaintiff, the Government violated, include managing fuels, carrying out adequate thinning to prevent overstocking and promote forest health, conducting adequate fire prevention and suppression, conducting forest rehabilitation after fire, and maintaining forest roads. ECF No. 11 at 17-19.

### A.      *Navajo II* step one.

Step one of the *Navajo II* test is two pronged. For a source of law to establish a fiduciary duty it must 1) bear the hallmarks of a conventional fiduciary relationship and 2) impose a specific obligation. *Hopi Tribe*, 782 F.3d at 667 (citing *Navajo II, 556* U.S. at 301). Because all the alleged fiduciary duties concern the same alleged fiduciary relationship, the court first examines whether Plaintiff's asserted sources of law, 25 U.S.C. §§ 406, 407, and 5109, their

implementing regulations at 25 C.F.R. § 163, and NIFRMA, ECF No. 11 at 14-16, evidence a conventional fiduciary relationship between the Federal Government and Indian forest lands.

        1.      <u>Statutory recognition of the trust relationship.</u>

As set out in *Ute Indian Tribe*, to satisfy step one of the *Navajo II* test, the asserted sources of law must identify: "a corpus, a trustee, a beneficiary, an intent to create a trust relationship, and duties with respect to the property . . . ." *Ute Indian Tribe*, 99 F.4th at 1368. Because the first four of these are the same for each statute at issue, the court addresses them first. It then turns to the specific duties Plaintiff alleges the Government breached to determine whether the statutes and regulations support its claims.

NIFRMA clearly recognizes the Federal Government's trust relationship to Indian Forest lands. In its declarations and findings, Congress states that "the United States has a trust responsibility toward Indian forest lands," 25 U.S.C. § 3101(2), and that "existing Federal laws do not sufficiently assure the adequate and necessary trust management of Indian forest lands . . . ." 25 U.S.C. § 3101(3).[1] NIFRMA's definition of "Indian land" provides that it is land which is "held by—(A) the United States in trust for . . . an Indian tribe . . . ." 25 U.S.C. § 3103(10)(A). NIFRMA also defines "Indian forest land" to mean "Indian lands, including commercial and non-commercial timberland and woodland, that are considered chiefly valuable for the production of forest products or to maintain watershed or other land values enhanced by forest cover, regardless of whether a formal inspection and land classification has been taken." 25 U.S.C. § 3103(3). Thus, NIFRMA makes clear the Federal Government holds Indian forest lands in trust for the benefit of Indian tribes like the Plaintiff.

Similarly, in 25 U.S.C. § 406, Congress recognizes the trust relationship and the corpus— "[t]he timber on any Indian land held under a trust or other patent containing restrictions on alienations may be sold by the owner or owners with the consent of the Secretary of the Interior . . . ." 25 U.S.C. § 406(a). Section 406 further confirms the trust relationship and the beneficiaries by requiring the proceeds of timber sales be paid to the owners (i.e., the tribes) after certain amounts are deducted to cover administrative expenses. *Id*. Section 407 similarly recognizes this trust relationship. It provides that "the timber on unallotted trust land in Indian reservations or on other land held in trust for tribes may be sold in accordance with the principles of sustained-yield management." 25 U.S.C. § 407.

Indeed, many courts examining 25 U.S.C. §§ 406, 407, and 5109, and their underlying regulations have likewise concluded this statutory regime evidences a broad and comprehensive fiduciary relationship. In *Mitchell II,* when the Supreme Court examined 25 U.S.C. §§ 406, 407, and 5109[2] and their implementing regulations, it recognized the "the comprehensive responsibilities of the Federal Government in managing the harvesting of Indian timber" and that

---

[1] 25 U.S.C. § 162a(d)(8) also lists the "[t]rust responsibilities of Secretary of the Interior" and states "[t]he Secretary's proper discharge of the trust responsibilities of the United States shall include . . . Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands."

[2] When the Supreme Court issued *Mitchell II*, Section 5109 was codified as 25 U.S.C. § 466.

"[t]he Department of the Interior—through the Bureau of Indian Affairs—exercises literally daily supervision over the harvesting and management of tribal timber." *Mitchell II*, 463 U.S. at 222 (cleaned up). *Mitchell II* went on to hold that Sections 406, 407, and 5109 "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Id.* at 224.

Since *Mitchell II*, courts regularly use this statutory and regulatory regime as the benchmark against which they measure other fiduciary duty claims. As the Supreme Court stated in *Navajo II*, "[In] *Mitchell II* . . . [w]e understood that statute [Section 406]—in combination with several other provisions and the applicable regulations—to create a fiduciary duty with respect to Indian timber." 556 U.S. at 294 (cleaned up); *see also White Mountain Apache Tribe*, 537 U.S. at 473-74 ("[In] *Mitchell II* . . . we found that statutes and regulations . . . gave the United States full responsibility to manage Indian resources and land for the benefit of the Indians, we held that they defined contours of the United States' fiduciary responsibilities beyond the 'bare' or minimal level"); *Confederated Tribes of Warm Springs Rsrv. of Or. v. United States*, 248 F.3d 1365, 1370 (Fed. Cir. 2001) ("Pursuant to statute and regulation, the United States exercises comprehensive control over the management and harvesting of timber on Indian reservations. As a result, the United States has a fiduciary responsibility to manage those timber resources . . . ."); *Hopi Tribe*, 782 F.3d at 667 ("Based on this trust-evoking language and the statutory and regulatory prescriptions giving the United States 'full responsibility' over Indian resources, the Supreme Court found that Congress had accepted a fiduciary duty to manage timber resources according to those specific prescriptions."); *Confederated Tribes & Bands of the Yakama Nation*, 153 Fed. Cl. at 695 ("The government has well-established fiduciary responsibilities [to the Indian people] in the forest management context.").

Furthermore, the fiduciary relationship to Indian timber recognized by 25 U.S.C. §§ 406, 407, and 5109 is not merely a general one or impermissibly "premised on control alone." *Navajo II*, 556 U.S. at 301. Instead, there are specific duties with respect to the forest—i.e. the trust corpus. 25 U.S.C. § 406(a) provides that "[t]he timber on any Indian land . . . may be sold . . . with the consent of the Secretary of the Interior" and charges that the Secretary of the Interior "shall take into consideration . . . the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs" and "the present and future financial needs of the owner and his heirs." 25 U.S.C. § 406(e) additionally dictates "[t]he timber on any Indian land held under a trust . . . may be sold by the Secretary of the Interior without the consent of the owners when in his judgment such action is necessary to prevent loss of values resulting from fire . . . ." 25 U.S.C. § 407 directs "the timber on unallotted trust land in Indian reservations or on other land held in trust for tribes may be sold in accordance with the principles of sustained-yield management . . . ." And 25 U.S.C. § 5109[3]

___

[3] It is, of course, true that the Circuit held in *Ute Indian Tribe* that "[a]lthough the Secretary had a 'duty . . . to prescribe such rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed,' this language falls short of creating a trust duty with respect to particular property . . . ." *Ute Indian Tribe*, 99 F.4th at 1365-66. The point here is simply that Congress directed the Secretary to manage the forest "on the principle of sustained-yield management," i.e., that the Secretary was to maintain a productive forest.

directs the Secretary "to make rules and regulations for the operation and management of Indian forestry units on the principle of sustained-yield management," meaning that the Secretary must preserve the trust corpus in a productive state.

This statutory regime clearly establishes that the Plaintiff's forest land is held in trust by the United States for the benefit of the Plaintiff, and that the United States acknowledges and accepts this trust relationship.  And there are certain provisions articulated in statute and regulation that establish fiduciary duties over the forest.  The question then, is whether the fiduciary duties Plaintiff claims were breached are included within the scope of duties arising under this trust relationship.  The court addresses these alleged duties in turn.

<div align="center">2.    <u>The duties with respect to the Indian Forest Land.</u></div>

For the second prong of *Navajo II* step one (and the fifth requirement of *Ute Indian Tribe*)—demonstrating that the asserted sources of law establish the fiduciary duties alleged—Plaintiff argues that 25 U.S.C. §§ 406, 407, and 5109, their underlying regulations, and NIFRMA establish each of the alleged duties that Plaintiff alleges the United States breached in this case.  Plaintiff contends that the comprehensive 25 U.S.C. §§ 406, 407, and 5109 "alone are sufficient to establish specific fiduciary duties"—and that NIFRMA buttresses this argument because it "further details the United States' specific and mandatory trust duties" and "was enacted in large part to provide specificity for the underlying fiduciary obligations set forth in broader terms in existing forestry statutes and regulations" like 25 U.S.C. §§ 406, 407, and 5109.  ECF No. 11 at 14, 17.  Thus, according to Plaintiff, "the statutes and regulations deemed to create specific fiduciary obligations in *Mitchell II*, and the comprehensive and mandatory requirements of NIFRMA, constitute the 'specific rights creating or duty-imposing statutory or regulatory prescriptions,' required to satisfy step one of the two-part test."  *Id.* at 16 (citing *Navajo I*, 537 U.S. at 506).

The Government raises several arguments against NIFRMA's ability to satisfy step one. Because Plaintiff partially relies in part upon NIFRMA's provisions for each of its alleged fiduciary duties, the court addresses the Government's objections to NIFRMA at the outset.

<div align="center">a)    *NIFRMA is mandatory and sufficiently specific.*</div>

The Government contends that NIFRMA is "insufficiently specific" and merely "lists objectives the Secretary and the tribes may choose to endorse and strive to meet."  ECF No. 14 at 6-7 (citations omitted).  As an initial matter, this argument addresses § 3104(b) and wholly ignores § 3104(a).  While § 3104(a) may be subject to various criticisms, a lack of specificity is not one of them.  Nor is it optional.

Because this is a statutory interpretation question, the court begins, as it must, with the language of the statute.  NIFRMA provides that "[t]he Secretary *shall* undertake forest land management activities on Indian forest land, either directly or through contracts, cooperative agreements, or grants under the Indian Self-Determination Act."  25 U.S.C. § 3104(a) (emphasis added).  It is, of course, commonly understood that "shall" is a non-discretionary command rather than a mere suggestion.  *E.g.*, *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320-21 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall'

<div align="center">8</div>

usually connotes a requirement.  'Shall' typically creates an obligation impervious to discretion .
. . .  When Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall'
imposes a mandatory duty.") (cleaned up); *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018)
("The word 'shall' generally imposes a nondiscretionary duty.").

The next question is what are the required "forest land management activities."  Again,
there is no specificity problem here.  NIFRMA explicitly defines "forest land management
activities" to mean "all activities performed in the management of Indian forest lands,
including":

> (1) "all aspects of program administration and executive direction .
> . .";
> (2) "all aspects of the development, preparation and revision of
> forest inventory and management plans . . .";
> (3) "*forest land development, including forestation, thinning, tree
> improvement activities, and the use of silvicultural treatments to
> restore or increase growth and yield to the full productive capacity
> of the forest environment*";
> (4) "*protection against losses from wildfire, including acquisition
> and maintenance of fire fighting equipment and fire detection
> systems, construction of firebreaks, hazard reduction, prescribed
> burning, and the development of cooperative wildfire management
> agreements*";
> (5) "protection against insects and disease . . .";
> (6) "assessment of damage caused by forest trespass, infestation or
> fire, including field examination and survey, damage appraisal,
> investigation assistance, and report, demand letter, and testimony
> preparation";
> (7) "all aspects of the preparation, administration, and supervision
> of timber sale contracts, paid and free use permits, and other Indian
> forest product harvest sale documents . . .";
> (8) "provision of financial assistance for the education of Indians
> enrolled in accredited programs of postsecondary and postgraduate
> forestry and forestry-related fields of study";
> (9) "participation in the development and implementation of tribal
> integrated resource management plans, including activities to
> coordinate current and future multiple uses of Indian forest lands";
> (10) "improvement and maintenance of extended season primary
> and secondary Indian forest land road systems"; and
> (11) "research activities to improve the basis for determining
> appropriate management measures to apply to Indian forest lands."

25 U.S.C. § 3103 (emphasis added).  One might wonder how Congress could have been any
more specific in defining "Indian forest land management activities."  Note too that 25 U.S.C.
§ 3104(a) provides that the Secretary shall engage in "forest land management activities."  It
does not say that the Secretary shall engage in only those forest land management activities that
the Secretary chooses to undertake.

b)    *NIFRMA's definitions do not create duties.*

The Government next argues that Plaintiff cannot rely on NIFRMA's definition of forest land management activities to create an enforceable duty.  Relying on *Evans v. United States*, 107 Fed. Cl. 442 (2012), the Government contends that "[d]efinitions do not create legal obligations or independent causes of action."  ECF No. 14 at 6.  While *Evans* is correct on that point given the facts presented in that case, it is easily distinguished from this case.  In *Evans*, the plaintiff sought to create a duty from the definitions in a statute alone—i.e., there was no provision other than definitions that Evans relied upon as a money-mandating source of law for his claim.  107 Fed. Cl. at 450 ("[T]he definitions do not by themselves grant this, or any other plaintiff, independent rights.").

Here, however, Plaintiff alleges that the operative language in 25 U.S.C. § 3104(a) instructs the executive how to manage certain fiduciary duties[4] and the definitions in § 3103 only provide the meaning of the term "Indian forest land management."  As the Government itself contends: "The definition of a term in the definitional section simply specifies the meaning of the term wherever it appears in the statute."  ECF No. 14 at 6 (citing *Fl. Dep't of Banking & Fin. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 800 F.2d 1534, 1536 (11th Cir. 1986)).  This is, of course, precisely the point.  The definitions in 25 U.S.C. § 3103 do not create any duties the Plaintiff alleges were breached, nor does the Plaintiff assert that they do.  The operative provision in Section 3104 is what instructs the executive how to manage the fiduciary duty to the Indian Forest Lands; Section 3103 merely provides Congress's definition of the terms it chose to use in its statute that this court must abide by.

c)    *NIFRMA's objectives are not in competition with each other.*

Similarly unavailing is the Government's contention that Section 3104(b)'s "objectives seek competing results that place commercial and profit-making goals in competition with aesthetic and environmental goals to preserve the forest in its natural state, protect wildlife, and preserve recreational opportunities and traditional values."  ECF No. 14 at 7.  As an example, the Government asks the court to "[c]ompare 25 U.S.C. § 3104(b)(3) (regulating to promote harvesting Indian timber on a sustained yield basis) with 25 U.S.C. § 3104(5) (retaining Indian forest land in its natural state to protect recreational, cultural, aesthetic, or traditional values)."  *Id.*  According to the Government, NIFRMA "does not instruct Interior to prioritize a particular goal or rank one of the competing objectives as superior to the others, but promotes flexibility based on tribal objectives."  *Id.*

The court does not share the Government's inability to reconcile Sections 3104(b)(3) and 3104(b)(5).  The objectives in Section 3104(b)(3) and the other sections of 3104(b) other than subsection (b)(5) make clear that the Secretary is to conduct the Indian forest land management activities to achieve a self-sustaining and productive forest for the Tribe's benefit.  Of course, NIFRMA recognizes that to maintain a self-sustaining forest operation there are some things that counsel against simply cutting down all the trees.  Thus, for example, NIFRMA lists as an

---

[4] NIFRMA largely instructs the executive how to manage existing fiduciary duties.  *See* 25 U.S.C. §§ 3101(3), 3102(1).  The court addresses whether NIFRMA creates, expands, or diminishes fiduciary duties below.

objective "the management and protection of forest resources to retain the beneficial effects to Indian forest lands of regulating water run-off and minimizing soil erosion." 25 U.S.C. § 3104(b)(6). That is not a competing objective, it is simply a direction to ensure the Secretary manage the forest to prevent erosion and water run-off.

Turning to Section 3104(b)(5), the professed lack of direction is the result of the Government's paraphrasing of the provision. The plain text clearly addresses how to balance the objective of leaving a forest in its natural state rather than making it a productive asset. Section 3104(b)(5)'s objective is: "the retention of Indian forest land in its natural state *when an Indian tribe determines* that the recreational, cultural, aesthetic, or traditional values of the Indian forest land represents the highest and best use of the land." (emphasis added). Contrary to the Government's contention, NIFRMA explicitly directs the Secretary how to prioritize the goals in Sections 3104(b)(3) and (b)(5)—Section 3104(b)(5) only seeks the retention of Indian forest land in its natural state when the relevant *Indian Tribe* determines that is the best use of the land. In other words, it is up to the Indian Tribe to prioritize maintaining a forest in its natural state and directs the Secretary to heed the Tribe's determination. Therefore, as Section 3104(b) does not provide competing objectives and contains no prioritization problems, the Government must follow the statutory directive that it "shall undertake forest land management activities on Indian forest land. . . to achieve" all the objectives provided. 25 U.S.C. § 3104(b).

It is also difficult to grasp the Government's confusion given that Congress did not create the deference to the Indian Tribes in Section 3104(b)(5). Before NIFRMA, it was up to the Indian Tribes to determine which lands would be left in their natural state. *E.g.*, 25 C.F.R. § 163.7(b) (1984) ("On any Indian forest lands not formally designated for retention in its natural state by authorized Indian representatives . . . ."). Thus, NIFRMA merely codified the status quo when Congress passed it. It did not create any ambiguity in the process.

> *d)   NIFRMA's allowance of tribal participation in forest management does not affect the analysis here.*

The Government also argues that NIFRMA cannot provide the basis for a fiduciary duty because "it 'would be out of line' for a statute to impose fiduciary duties where one of the principal statutory purposes is enhancing Tribal self-determination in the management of their resources." ECF No. 7 at 17 (quoting *Navajo I*, 537 U.S. at 491). But the Government's reliance on *Navajo I* is misplaced. *Navajo I* dealt with a breach of fiduciary duty claim based on the Indian Mineral Leasing Act, 25 U.S.C. § 396a et seq. ("IMLA"), which granted the tribes the ability to negotiate leases for mineral rights on their lands subject to secretarial approval. 537 U.S. at 493-94. Prior to the passage of IMLA, the Government controlled all leasing and even granted some leases over tribal objections. *Id.* According to the Supreme Court, "[t]he IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties." *Id.* at 508 (citation omitted). That is not the case with NIFRMA.

While it is true that NIFRMA *allows* the tribes to perform forest land management activities, NIFRMA does not give the tribes the lead role. To the contrary, Section 3104(a) provides that "[t]he *Secretary* shall undertake forest land management activities on Indian forest land, *either directly or* through contracts, cooperative agreements, or grants under the Indian

Self-Determination Act." (emphasis added). Thus, the Secretary may *either* directly undertake forest land management activities or perform them with tribal input under the Indian Self-Determination Act (or, perhaps, through a combination of the two). But choosing not to perform "forest land management activities on Indian forest land" is not an option that NIFRMA leaves open to the Secretary. Unlike IMLA, NIFRMA maintains the Secretary's primacy in ensuring the forest management activities happen, even though he may agree to let the tribes take a greater role in the decision-making.[5]

> e)    *NIFRMA's disclaimer provision does not automatically bar the Plaintiff's claims.*

Finally, the Government argues NIFRMA cannot establish any fiduciary duties because Section 3120 provides that "[n]othing in this chapter shall be construed to diminish or expand the trust responsibility of the United States toward Indian forest lands . . . ." 25 U.S.C. § 3120. Relying on the D.C. Circuit, the Government contends that Section 3120 "evidenced Congress' intent not to create any fiduciary duty . . . ." ECF No. 7 at 17 (citing *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863 (D.C. Cir. 2014)).

While the court agrees that Section 3120 means that NIFRMA cannot "diminish or expand the trust responsibility of the United States," that does not answer the question. As examined below, most of NIFRMA's prescriptions do not expand the Government's trust responsibility—they simply direct the Government how to manage its current and historic trust responsibility to Indian forest lands and timber that NIFRMA itself recognizes. It is also readily apparent that Congress was not drafting NIFRMA on a clean slate; rather, Congress drafted it with a clear understanding of the state of the law at the time. To begin, NIFRMA acknowledged a pre-existing trust responsibility to manage Indian forest lands which clearly reflects Congress's acceptance of *Mitchell II*. Indeed, it states in its findings that "the United States has a trust responsibility toward Indian forest lands." 25 U.S.C. § 3101(2). That, of course, is the core holding of *Mitchell II*. 463 U.S. at 224 (concluding that the statutory and regulatory regime governing Indian timber "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians [and] thereby establish a fiduciary relationship . . ."). Congress also determined that "existing Federal laws do not sufficiently assure the adequate and necessary trust management of Indian forest lands." 25 U.S.C. § 3101(3). This further indicates that Congress intended to address the management of *existing* trust duties.

As the Plaintiff puts it, "NIFRMA was enacted in large part to provide specificity for the underlying fiduciary obligations set forth in broader terms in existing forestry statutes and regulations." ECF No. 11 at 17. In other words, Congress clearly drew from pre-existing statutes and regulations when crafting NIFRMA. Take, for instance, NIFRMA's direction to the Secretary to undertake "all aspects of the preparation, administration, and supervision of timber

---

[5] For the avoidance of doubt, the court is not holding that the Confederated Tribes were not involved in the forest land management activities at issue in this case. The record before the court at this preliminary stage sheds no light on how involved the Confederated Tribes may have been. For the purposes of this motion to dismiss, the court assumes the Secretary made the challenged decisions as the Plaintiff alleges.

sale contracts, paid and free use permits, and other Indian forest product harvest sale documents . . . ." 25 U.S.C. § 3103(4)(G). This obligation clearly preexisted NIFRMA—it traces all the way back to 1911 and was the focus of *Mitchell II*. *Mitchell II*, 463 U.S. at 220-26. Thus, as Plaintiff argues, NIFRMA did not create this duty, but provided Congress's direction on how to manage it. As another member of this court recently explained: "The list of objectives in 25 U.S.C. § 3104 clarify the government's fiduciary obligations to the tribes . . . . Congress' subsequent clarification of the government's fiduciary duties related to tribal forest resources . . . suggests an intent to eliminate ambiguity related to the government's obligations . . . ." *Confederated Tribes & Bands of the Yakama Nation*, 153 Fed. Cl. at 703-04. Thus, "NIFIRMA's additional prescriptive language clarifies what trust duties the government already owes to tribes in managing their timber resources under the other forest management statutes." *Id.* at 705.

The Government's reliance on *El Paso Natural Gas Co. v. United States* is also unavailing. The issue in *El Paso Natural Gas Co*. was whether the statute *independently* created enforceable trust duties. *See El Paso Nat. Gas Co.*, 750 F.3d at 898 ("Nor does the Indian Agricultural Act impose *independently* enforceable trust duties.") (emphasis added); *see also Pawnee Nation of Oklahoma v. Zinke*, No. 16-CV-697-JHP-TLW, 2017 WL 4079400, at *5 (N.D. Okla. Sept. 14, 2017) ("AIARMA does not *itself* set forth specific trust duties") (emphasis added); *Aleck v. United States*, No. CV 04-277 AS, 2005 WL 1586939, at *4 (D. Or. June 21, 2005), *report and recommendation adopted in part*, No. CV 04-277 AS, 2005 WL 2709502 (D. Or. Oct. 21, 2005) ("Nothing in AIARMA can be construed to constitute a waiver of the United States's sovereign immunity to plaintiffs' trespass claims."). Here, NIFRMA builds upon an *existing* trust obligation already owed to the Plaintiff and provides Congress's direction on how to manage the duties encompassed by the existing trust obligation.

        3.    The alleged breaches of fiduciary duties.

With those preliminary matters resolved, the court turns to the final question of *Ute Indian Tribe*—whether the statutes and regulations at issue provide the fiduciary duties that Plaintiff alleges the United States violated. The court addresses each alleged breach in turn.

            a)    *Plaintiff alleges a breach of a fiduciary duty to manage fuels and carry out adequate tree thinning and forest health measures on the Indian forest land within the Colville Reservation.*

The Plaintiff alleges that the Government breached its duty "to adequately manage fuels on the Colville Reservation" and "conduct adequate fuels management measures, including prescribed burning." ECF No. 1 ¶¶ 64-65; *see also id.* ¶¶ 62-69. The Plaintiff also alleges the Government breached its duty "to maintain the health of the Tribes' forests" and "conduct thinning operations necessary to accelerate commercial growth and prevent overstocking" on the Colville Reservation. *Id.* ¶¶ 64, 70-78. While Plaintiff addresses these duties separately, due to their overlapping nature, the court addresses them together.

According to the Plaintiff, the specific fiduciary duty to manage fuels stems from multiple sources, one of which is NIFRMA, 25 U.S.C. § 3103(4)(D). ECF No. 11 at 17. Section 3103(4)(D) requires the "protection against losses from wildfire, including acquisition and

maintenance of fire fighting equipment and fire detection systems, construction of firebreaks, *hazard reduction, prescribed burning*, and the development of cooperative wildfire management agreements . . . ." 25 U.S.C § 3103(4)(D).  And Plaintiff argues the duty to conduct adequate tree thinning and promote forest health is based in NIFRMA's "statutory direction for 'timber stand improvement,' 25 U.S.C. § 3104(b)(1)(C), as well as 25 U.S.C. § 3103(4)(C)."  ECF No. 11 at 17.  Indeed, Section 3103(4)(C) obligates "forest land development, including forestation, *thinning*, *tree improvement activities, and the use of silvicultural treatments to restore or increase growth and yield to the full productive capacity of the forest environment . . . .*"  25 U.S.C. § 3103(4)(C) (emphasis added).  And one of the objectives the "forest land management activities undertaken by the Secretary shall be designed to achieve" is "timber stand improvement."  25 U.S.C. § 3104(b)(1)(C).

NIFRMA's provisions concerning thinning, forest health, and fuels management clearly contain "specific rights-creating or duty-imposing" prescriptions.  *Navajo II*, 556 U.S. at 301 (cleaned up).  But again, NIFRMA may only satisfy *Navajo II* step one if it provides direction on a pre-existing fiduciary duty to Indian forest lands as established by the statutory and regulatory regime discussed in *Mitchell II*.  As acknowledged above, Plaintiff claims these duties spring from 25 U.S.C. §§ 406, 407, and 5109, as well as their implementing regulations.  And recall that *Mitchell II* relied on Sections 406, 407, and 5109, and the regulations promulgated under those acts to conclude that the United States owed fiduciary duties regarding the management of Indian forests.  This court, therefore, reviews these regulations to understand whether duties to conduct fuel management as well as thinning and forest health measures pre-existed NIFRMA.  25 U.S.C. §§ 406, 407, and 5109's prior implementing regulations included duties to manage fuels and conduct related actions to ensure forest health—just as NIFRMA does now.

Like the Supreme Court in *Mitchell II*, the court begins its review of the regulatory history with the 1911 Indian forest regulations, which were promulgated under what is now 25 U.S.C. §§406, 407, and 5109.  *Mitchell II*, 463 U.S. at 219-20; *see also* Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations (approved June 29, 1911) (the "1911 Regs.").  These regulations mandate that special forest officers on Indian forest lands "shall thoroughly familiarize themselves with all phases of forestry work on the reservations . . . including a knowledge of . . . the total stand of timber, of the relative quantity, rapidity of growth, seeding qualities, character of reproduction, adaptability to location, etc., of the different species found" as well as "acquaint themselves with . . . all other practical and technical work which will aid the office in so managing the Indian forests as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests."  1911 Regs. § 2.  Clearly, special forest officers were expected to be knowledgeable about all aspects of "practical and technical" forest work to ensure that the forest remains productive for the benefit of the Indian tribes.  It is not a far jump to surmise that this technical and practical work included actions like thinning and managing fuels—especially considering that the 1911 Regulations also reflect the Government's specific obligations to manage fuels on Indian Forest Lands:

> Ordinarily the brush should be piled at the time of cutting and burned either as piled or as soon thereafter as it can be conveniently done.  A good time to burn brush which has accumulated during the summer or lain over from the previous

winter's logging is directly after the first fall of snow in the autumn.  Where there is a special danger of soil erosion, or where on a steep slope or in a dry locality a soil covering is needed to insure reproduction, the brush may be scattered.  Occasionally the burning of brush will be impracticable because of the density of the stand of timber which is not cut.  The piling and burning of the brush should be insisted upon in all cases where there is any substantial doubt as to the method and be used.  Superintendents and special forest officers in charge of timber operations are particularly cautioned that the careful consideration of such questions and the strictest supervision of such brush disposal, to the end that fire danger is reduced to the minimum, will be required by the office.

1911 Regs. § 28.

Like the 1911 Regs, the 1966 Regulations also mandated similar technical and practical duties to ensure the forest's health and growth, prescribing that:

> (a) The following objectives are to be sought in the management of unallotted Indian forest lands in accordance with the principles of sustained yield: (1) *The preservation of such lands in a perpetually productive state by providing effective protection, by applying sound silvicultural and economic principles to the harvesting of the timber*, and by making adequate provision for new forest growth as the timber is removed. 2) The regulation of the cut in a manner which will insure method and order in harvesting the tree capital, so as to make possible continuous production and a perpetual forest business.

25 C.F.R. § 141.3 (1966) (emphasis added).

The 1982 Regulations, the regulations in effect at the time of *Mitchell II*, similarly instruct the Secretary to use silvicultural principles to maintain and preserve forest health and growth:

> The following objectives are to be sought in the management of unallotted Indian forest lands in accordance with the principles of sustained yield: (1) The preservation of such lands in a perpetually productive state by providing effective protection, by applying sound silvicultural and economic principles to the harvesting of the timber, and by making adequate provision for new forest growth as the timber is removed.

25 C.F.R. § 163.3(a) (1982)  And the 1984 Regulations, the regulations in effect at the time of NIFRMA, do the same:

> The following objectives apply to the management of Indian forest lands. (a) The development, maintenance and enhancement of commercial forest lands in perpetually productive state by providing effective management and protection through the application of sound silvicultural and economic principles to the reforestation, growth and harvesting of timber and other forest products. This includes making adequate provision for new forest growth as the timber is removed.

25 C.F.R. § 163.3 (1984). The 1984 Regulations also call for fuels management duties: "Upon consultation with the Indian landowners, the Secretary may use fire as a management tool on Indian reservations to achieve land or resource management objectives." 25 C.F.R. § 163.21(d) (1984).

This "applying sound silvicultural and economic principles" and "making adequate provision for new forest growth as the timber is removed" language in these prior regulations is remarkably similar to NIFRMA's Section 3103(4)(C) obligating "tree improvement activities, and the use of silvicultural treatments to restore or increase growth and yield to the full productive capacity of the forest environment . . . ." 25 U.S.C. § 3103(4)(C). The definition of silviculture is also helpful to this analysis. The U.S. Forest Service defines silviculture as "the art and science of controlling the establishment, growth, composition, health, and quality of forests and woodlands to meet the diverse needs and values of landowners and society such as wildlife habitat, timber, water resources, restoration, and recreation on a sustainable basis" and explains that "[t]his is accomplished by applying different types of silvicultural treatments such as *thinning*, harvesting, planting, pruning, *prescribed burning* and site preparation." *Forest Service Silviculture*, U.S. Forest Service, (last visited Apr. 29, 2024), *available at* https://www.fs.usda.gov/forestmanagement/vegetation-management/silviculture/index.shtml (emphasis added). Indeed, current statutes also show that thinning and prescribed burning are standard silvicultural activities. 16 U.S.C. § 2102(a)(10)(C) (enabling the Secretary to provide certain assistance to forest landowners in "the management of resources of forest lands, including . . . the planning, management, and treatment of forest land, including site preparation, reforestation, *thinning, prescribed burning, and other silvicultural activities* designed to increase the quantity and improve the quality of timber and other forest resources") (emphasis added). Tree thinning and fuels management have been encompassed in the prior regulations' prescription to engage in silvicultural work.

Clearly, the Federal Government's duty to manage Indian forests as set forth by the 25 U.S.C. §§ 406, 407, and 5109 is a comprehensive one. And as evidenced by the prior regulatory regime, it has been understood to require the Government to apply certain "sound silvicultural and economic principles" like thinning and fuels management to ensure forest preservation, improvement, and continuous commercial growth. NIFRMA's mandate to manage fuels, conduct adequate tree thinning to accelerate growth, and promote forest health, 25 U.S.C § 3103(4)(D), 25 U.S.C. § 3104(b)(1)(C), 25 U.S.C. § 3103(4)(C), is a clear clarification of this pre-existing trust duty to engage in silvicultural activities ensuring Indian forests' health and productivity. As explained above, NIFRMA's language even mirrors the language of the prior regulations. Therefore, the court finds that the statutory and regulatory regime creates the duties to engage in fuels management and tree thinning that Plaintiff alleges the United States breached.

>    b)    *Plaintiff alleges a breach of a fiduciary duty to conduct fire*
>    *prevention and suppression on the Indian forest land within the Colville*
>    *Reservation.*

Plaintiff also alleges the Government breached its duty to "conduct adequate fire prevention" and "provide adequate fire suppression resources" on the Colville Indian Forest Lands.  ECF No. 1 ¶¶ 85, 90; *see id.* ¶¶ 85-89, 90-94.  According to the Plaintiff, these fiduciary duties stem from 25 U.S.C. § 3103(4)(D), 25 U.S.C. §§ 406, 407, and the implementing regulation 25 C.F.R. § 163.28.  ECF No. 11 at 18.  Indeed, NIFRMA specifically obligates "protection against losses from wildfire, including acquisition and maintenance of fire fighting equipment and fire detection systems, construction of firebreaks, hazard reduction, prescribed burning, and the development of cooperative wildfire management agreements."  25 U.S.C. § 3103(4)(D).  And the implementing regulation, 25 C.F.R. § 163.28, authorizes the Secretary to take certain fire prevention and suppression actions.  It states:

>    (a) The Secretary is authorized to maintain facilities and staff, hire
>    temporary labor, rent fire fighting equipment, purchase tools and
>    supplies, and pay for their transportation as needed, to maintain an
>    adequate level of readiness to meet normal wildfire protection
>    needs and extinguish forest or range fires on Indian land . . . . The
>    Secretary may also enter into reciprocal agreements with any fire
>    organization maintaining protection facilities in the vicinity of
>    Indian reservations or other Indian land for mutual aid in wildfire
>    protection. This section does not apply to the rendering of
>    emergency aid, or agreements for mutual aid in fire protection
>    pursuant to the Act of May 27, 1955 (69 Stat. 66).
>
>    (b) The Secretary is authorized to conduct a wildfire prevention
>    program to reduce the number of person-caused fires and prevent
>    damage to natural resources on Indian land.
>
>    (c) The Secretary is authorized to expend funds for emergency
>    rehabilitation measures needed to stabilize soil and watershed on
>    Indian land damaged by wildfire.
>
>    (d) Upon consultation with the beneficial Indian owners, the
>    Secretary may use fire as a management tool on Indian land to
>    achieve land and/or resource management objectives.

Plaintiff thus argues "[t]he protection of forests for all of the commercial and non-commercial uses denoted in 25 U.S.C. § 3104, 25 U.S.C. §§ 406, 407, and related authority necessitates that the forest not needlessly burn down."  ECF No. 11 at 18.

The Government insists that 25 U.S.C. §§ 406, 407, 5109, and their regulations are not specific enough to establish fiduciary duties regarding fire protection, and that *Mitchell II*'s holding on the Government's fiduciary duties to Indian timber is restricted to its involvement in timber sales.  ECF No. 7 at 19.  The Government also argues the implementing regulation does

not impose money-mandating duties because the regulation's language is discretionary.  *Id.* at 21.

The court focuses on the specific statutory and regulatory provisions that address fire protection of, and forestry in, the Indian forests.  While the duties to conduct adequate fire prevention and suppression are not explicitly named in 25 U.S.C. §§ 406, 407, and 5109, like they are in NIFRMA, this does not mean that 25 U.S.C. §§ 406, 407, and 5109 and their underlying regulations do not require these actions.  Surely, part of the fiduciary duty to consider "the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs" and "the present and future financial needs of the owner and his heirs," 25 U.S.C. § 406(a), includes considering forest health, conducting adequate fire prevention, and the like.  As does making "rules and regulations for the operation and management of Indian forestry units on the principle of sustained-yield management . . . ." 25 U.S.C. § 5109.  Of course, one cannot ensure the perpetual productivity of a forest if one lets it burn to the ground.  *See* 25 C.F.R. § 163.1 ("Sustained yield means the yield of forest products that a forest can produce continuously at a given intensity of management.").  The statutes even acknowledge that the Government's trust responsibilities to Indian forest lands include protecting the land and managing it in a way so that damage is minimized when natural disasters such as fires occur.  *See* 25 U.S.C. § 406(e).  And while it is true that the regulations provide for secretarial "authorization" to engage in these activities, the court does not agree with the Government that this language makes the entire matter discretionary.  Rather, the better reading of 25 C.F.R. § 163.28 is that the Secretary has to engage in fire protection activities and is authorized to do so directly (e.g., purchase of equipment and hiring personnel) and/or through agreements with surrounding communities.  That discretion does not include the option to forego providing fire protection.

The Federal Circuit's recent decision in *Ute Indian Tribe* provides clear guidance on how to consider this alleged breach.  To understand *Ute Indian Tribe*, one must understand the Supreme Court's *White Mountain Apache* decision.  There the Supreme Court held that it could be inferred from the statute at issue that the Government had "an obligation to preserve the property improvements [that] was incumbent on the United States as trustee."  *White Mountain Apache Tribe,* 537 U.S. at 475.  While the statute did not explicitly enumerate this obligation, the Court found because the statute established a "fiduciary relationship" to the property and the Government "has obtained control at least as plenary as its authority over the timber in *Mitchell II*" such an inference was permissible.  *Id.*  The Court further explained: "[t]his is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch.  One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets."  *Id.* (cleaned up).  The Court explicitly likened the situation to *Mitchell II* and admitted the fiduciary responsibilities in *Mitchell II* were more robust than the statute at issue and "expressly subject the Government to duties of management and conservation . . . ."  *Id.*

In *Ute Indian Tribe,* the plaintiff alleged the Government had breached its fiduciary duties by letting irrigation systems fall into a "grave state of disrepair."  *Ute Indian Tribe,* 99 F.4th at 1368.  The Federal Circuit found "[t]he 1906 Act, by its plain text, establishes that the United States accepted a duty to 'hold and operate' the described irrigation systems 'in trust for the Indians.'"  *Id.*  The Federal Circuit, therefore, found the 1906 Act, "like the statute at issue in

*White Mountain Apache* . . . goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee to protect and preserve the property." *Id.* The Circuit thus held that the Tribe's allegations "are sufficient to clear the first step of the jurisdictional analysis in *Navajo I* with respect to the failure to maintain water infrastructure." *Id. Ute Indian Tribe* mirrors the case before this court. First, the Federal Government's fiduciary relationship that the 1906 Act established to the Tribes' irrigation systems in *Ute Indian Tribe* is quite like the fiduciary relationship to Indian forest lands. In both cases, the Federal Government holds and operates the trust asset, and has "comprehensive" duties with respect to the trust asset. *See* 25 U.S.C. § 406(a) ("[t]he timber on any Indian land held under a trust . . . ."); 25 U.S.C. § 3101(2) ("the United States has a trust responsibility toward Indian forest lands"). Sections 406, 407 and 5109 and their regulatory regime altogether "give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." *Mitchell II*, 463 U.S. at 224. The Government "exercises literally daily supervision over the harvesting and management of tribal timber," *id.* at 222, and withholds a reasonable deduction from timber sales "to cover in whole or part the cost of managing and protecting such Indian forest land." 25 U.S.C. § 3105(a). Similarly in *Ute Indian Tribe,* "[t]he Tribe's complaint alleged that the United States . . . exercises pervasive and comprehensive control of the UIIP [Uintah Indian Irrigation Project], including through assessing operation fees, performing maintenance and rehabilitation, regulating project structures, and executing carriage agreements with other water users." *Ute Indian Tribe,* 99 F.4th at 1368 n.6 (cleaned up).

Second, the fiduciary duties allegedly breached are similar as well—in both cases, the plaintiffs allege the Government failed to preserve trust property. Here, Plaintiff alleges the Government breached its duty to preserve and protect Indian forest lands from fires and in *Ute Indian Tribe*, the plaintiff alleged the Government failed to preserve and maintain the irrigation systems (i.e. the corpus of the trust). Indeed, Plaintiff's allegations in this case are essentially the same as the ones the Federal Circuit found to be "sufficient to clear the first step of the jurisdictional analysis in *Navajo I* . . . ." *Id.* at 1368. Given the many cases recognizing the comprehensive trust responsibility the Government has toward Indian forests, *Mitchell II*, 463 U.S. at 224; *Confederated Tribes of Warm Springs Rsrv. of Or.*, 248 F.3d at 1370; *Hopi Tribe*, 782 F.3d at 667; *Confederated Tribes & Bands of the Yakama Nation*, 153 Fed. Cl. at 695, and the holdings from *Ute Indian Tribe* as well as *White Mountain Apache*, the Government is subject to duties as a trustee to protect and preserve Indian forest lands.

A review of the history of the Government's management of Indian forests confirms the need for the Government to provide fire protection and suppression for the forests. In *Mitchell II*, the Supreme Court reviewed the history of forest management regulations and recognized that "[f]rom the outset, the Interior Department recognized its obligation to supervise the cutting of Indian timber." *Mitchell II*, 463 U.S. at 220. The same is true regarding fires—the prior regulations call for numerous fire prevention and suppression activities, and thus NIFRMA's prescriptions are a clear clarification of pre-existing duties.

The 1911 Regulations explicitly called for fire prevention efforts by the Government. These regulations mandated that forest officers "acquaint themselves with . . . all other practical and technical work which will aid the office in so managing the Indian forests as to obtain the greatest revenue for the Indians *consistent with a proper protection . . . of the forests*." 1911 Regs. § 2 (emphasis added). The regulations make clear that this protection of the forests

included fire protection. Indeed, forest guards working for the Government had to "patrol their districts to prevent and report . . . fires," and perform other tasks, including building "fire lines for the proper protection and administration of the forests." 1911 Regs. § 3. And the 1911 Regulations also required added diligence in times of high fire risk, recognizing the obvious: "During dry and dangerous periods the selection of headquarters, camping places, and routes should be made with the single object of preventing and discovering fires." 1911 Regs. § 6. Similarly, the regs recognized "[f]ires caused by lightning are not rare, especially in dry mountain regions. After every electric storm a special effort should be made to locate and extinguish any such fires before they are well under way." *Id.*; *see also id*. § 3 ("[A]t times of unusual fire danger the superintendent should detail the [Indian] police to special patrol for the prevention of fire.").

By their plain terms, these regulations detail all aspects of fire protection for Indian forests, from the work to be done to the selection of campgrounds for forest guards to increase fire prevention. In fact, the regulations even detail how and when to dispose of cleared brush to minimize fire hazards:

> Ordinarily the brush should be piled at the time of cutting and burned either as piled or as soon thereafter as it can be conveniently done. A good time to burn brush which has accumulated during the summer or lain over from the previous winter's logging is directly after the first fall of snow in the autumn. Where there is a special danger of soil erosion, or where on a steep slope or in a dry locality a soil covering is needed to insure reproduction, the brush may be scattered. Occasionally the burning of brush will be impracticable because of the density of the stand of timber which is not cut. The piling and burning of the brush should be insisted upon in all cases where there is any substantial doubt as to the method and be used. Superintendents and special forest officers in charge of timber operations are particularly cautioned that the careful consideration of such questions and the strictest supervision of such brush disposal, to the end that fire danger is reduced to the minimum, will be required by the office.

1911 Regs. § 28. Finally, the regulations also called upon forest officers to detect unlawful fires in Indian forests. 1911 Regs. § 6 (stating "[f]orest officers should use all diligence in the detection of parties guilty of a violation of" the Fire Law, 36 Stat. L. 855-57, which penalized setting fires on Indian lands without extinguishing it).

To be sure, the 1911 Regulations do provide for the Tribes to perform some of the fire protection for the reservations: "It shall be the duty of the Indian police to prevent and suppress forest and grass fires as far as possible, and failure on their part to perform such duties, or to report promptly any fire which they can not control, will constitute sufficient grounds for dismissal . . . ." 1911 Regs. § 4. But this is one provision among many that apply to the Government and its personnel. Therefore, the court concludes that this one provision mandating

a role for the Indians in fire prevention and suppression did not absolve the Government of its fire prevention and suppression duties.

The 1966 Regulations likewise recognized the Government had various fire prevention and suppression duties.  Many of these regulations required the Government to prevent losses from fires and react to emergencies such as fires.  *See* 25 C.F.R. § 141.4 ("Cutting schedules shall be directed toward the salvage of timber that is deteriorating as a result of fire damage . . . and toward achieving an approximate balance between maximum net growth and harvest during each cutting cycle."); 25 C.F.R. § 141.7(b) (1966) ("The Secretary may sell the timber on any Indian land held under a trust . . . without the consent of the owners when in his judgment such action is necessary to prevent loss of values resulting from fire . . . ."); 25 C.F.R. § 141.8(b) (1966) ("The approving officer may reduce the advertising period because of emergencies such as fire . . . ."); 25 C.F.R. § 141.18 (1966) ("In sales of timber . . . a reasonable deduction shall be made . . . to cover in whole or in part the cost of managing and protecting the forest lands . . . but not including the costs that are paid from funds appropriated specifically for fire suppression or forest pest control.").  The 1966 Regulations also authorized the Secretary to hire firefighters, purchase or rent firefighting equipment, and enter into mutual aid agreements with local jurisdictions to provide fire protection.  25 C.F.R. § 141.21 (1966) (titled "Fire protective measures" implementing same language as the current 25 C.F.R. § 163.28).  And these 1966 Regulations acknowledged that these duties to protect the forest sprang from the statutory directive to manage Indian forest lands in accordance with the principles of sustained yield. 25 C.F.R. § 141.3(a) (1966) provides "[t]he following objectives are to be sought in the management of unallotted Indian forest lands in accordance with the principles of sustained yield: (1) The preservation of such lands in a perpetually productive state by providing *effective protection*, by applying sound silvicultural and economic principles to the harvesting of the timber, and by making adequate provision for new forest growth as the timber is removed." (emphasis added).

The 1982 Regulations also mandate the Government perform certain duties to prevent losses from fire as well as fire prevention and suppression duties.  As an initial matter, the language from 25 C.F.R. § 141.21 (1966) carries forward in 25 C.F.R. § 163.21 (1982).  The 1982 Regulations also instruct the Government to act in a way that minimizes losses from fire. *See* 25 C.F.R. § 163.4 (1982) ("Cutting schedules shall be directed toward the salvage of timber that is deteriorating as a result of fire damage. . . ."); 25 C.F.R. § 163.7(b) (1982) ("The Secretary may sell the timber on any Indian land held under a trust or other patent containing restrictions on alienations without the consent of the owners when in his judgment such action is necessary to prevent loss of values resulting from fire . . . ."); 25 C.F.R. § § 163.18 (1982) ("In sales of timber . . . a reasonable deduction shall be made . . . to cover in whole or in part the cost of managing and protecting the forest lands. . . but not including the costs that are paid from funds appropriated specifically for fire suppression . . . .").  Further, the 1982 Regulations acknowledged that the duty to protect the forest was based in the statutory directive to manage Indian forest lands in accordance with the principles of sustained yield, stating: "[t]he following objectives are to be sought in the management of unallotted Indian forest lands in accordance with the principles of sustained yield: (1) The preservation of such lands in a perpetually productive state *by providing effective protection*, by applying sound silvicultural and economic principles to the harvesting of the timber, and by making adequate provision for new forest growth as the timber is removed."  25 C.F.R. § 163.3(a)(1) (1982) (emphasis added).

The 1984 Regulations, the ones in effect at the time of NIFRMA, similarly demonstrate the historical reality that the Government accepted fire prevention and suppression duties.  These regulations made clear that "'Forest protection' includes the protection of Indian forest resources from damages and losses by . . . fire . . . .  It also includes protection of wild lands from fire."  25 C.F.R. § 163.1 (1984).  And the 1984 Regulations instructed that "[t]he Secretary will conduct a wildfire prevention program to reduce the number of person-caused fires on Indian reservations or other Indian trust lands" and authorized the Secretary "to expend funds for emergency rehabilitation measures needed to stabilize soil and watershed on Indian reservations or other Indian trust lands damaged by wildfire."  25 C.F.R. § 163.21(b)-(c) (1984).  These 1984 Regulations also mandated the same fire duties as the 1982 and 1966 Regulations.  *Compare* 25 C.F.R. § 163.21(a) (1984) *with* 25 C.F.R. § 141.21 (1966) *and* 25 C.F.R. § 163.21 (1982).[6]  And the same obligations to minimize harm carry forward as well.  *See* 25 C.F.R. § 163.18 (1984) ("In sales of forest products from Indian forest lands, a reasonable deduction shall be made . . . to cover in whole or in part the cost of managing and protecting the forest lands . . . such deductions are not intended to cover the costs that are paid from funds appropriated specifically for fire suppression . . . ."); 25 C.F.R. § 163.4 (1984) ("Harvest schedules shall be directed toward achieving an approximate balance . . . between maximum net growth and harvest, and shall salvage timber that is deteriorating from fire damage . . . .").  And like the regulations before them, the 1984 Regulations recognized that the duty to protect the forest comes from the statutory directive to manage the forest in accordance with the principles of sustained yield.  *See* 25 C.F.R. § 163.3(a) (1984) ("The following objectives apply to the management of Indian forest lands. (a) The development, maintenance and enhancement of commercial forest lands in perpetually productive state by providing effective management and protection through the application of sound silvicultural and economic principles to the reforestation, growth and harvesting of timber and other forest products."); 25 C.F.R. § 163.1 (1984) ("'Forest protection' includes the protection of Indian forest resources from damages . . . fire . . . .").

For decades, the Government's duty to manage the forest in accordance with the principles of sustained yield has been understood as including effective protection of the forest against fires.  That, coupled with the duty to preserve a trust corpus and the specific statutory obligations discussed above, satisfy step one of the *Navajo II* test.

> c)      *Plaintiff alleges a breach of a fiduciary duty to rehabilitate the Indian forest land within the Colville Reservation after the fires.*

Plaintiff next alleges the Government breached its fiduciary duty to rehabilitate the forest after the fires, failing to "ensure the return of the Tribes' forests to a productive state," and "restore damaged roads, control soil erosion, conduct mulching and seeding, clean and repair culverts, and conduct replanting."  ECF No. 1 ¶¶ 95-103.  Plaintiff asserts this duty is based in 25 U.S.C. §§ 3103(4)(F) and (4)(C), 25 U.S.C. §§ 406(a) and (e), 407, 5109, and 25 C.F.R. §§ 163.28, 163.32.  ECF No. 11 at 19.  According to the Plaintiff, 25 U.S.C. § 3103(4)(F) obligates "assessment of damage caused by . . . fire, including field examination and survey, damage appraisal, investigation assistance, and report, demand letter, and testimony preparation."  Similarly, 25 U.S.C. § 3103(4)(C) obligates "forest land development, including

---

[6] This language is substantively unchanged in the current regulations.  *See* 25 C.F.R. § 163.28.

forestation . . . tree improvement activities, and the use of silvicultural treatments to restore or increase growth and yield to the full productive capacity of the forest environment."  And, according to Plaintiff, 25 U.S.C. § 406(a) "requires the Secretary to consider 'the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs,' which relies in part on replanting after harvest or disturbance," ECF No. 11 at 19 (citing 25 U.S.C. 406(a)), and Sections 407 and 5109 "require[] sustained yield forestry, which necessitates replanting."  ECF No. 11 at 19.  In terms of the regulations, 25 C.F.R. § 163.28(c) authorizes the Secretary "to expend funds for emergency rehabilitation measures needed to stabilize soil and watershed on Indian land damaged by wildfire."  Similarly, 25 C.F.R. § 163.32 instructs that "Forest development . . . shall consist of reforestation, timber stand improvement projects, and related investments to enhance productivity of commercial forest land . . . ."

25 U.S.C. §§ 406, 407, 5109, and the regulations promulgated under them, along with NIFRMA's directions, establish a specific duty to rehabilitate Indian forest lands after fire.  One is not considering "the state of growth of the timber and the need for maintaining the productive capacity of the land for the benefit of the owner and his heirs," 25 U.S.C. § 406(a), if one is allowing the forest to remain unfruitful and not replanting to account for trees lost.  Indeed, it seems impossible to ensure the perpetual productivity of a forest (and to prescribe rules and regulations to that effect) without replanting after trees are harvested or burned down.  25 U.S.C. § 5109; 25 C.F.R. § 163.1; 25 C.F.R. § 163.32.  Thus, rehabilitating and regenerating the forest is just as much a duty to manage the forest in accordance with principles of sustained yield as conducting fire prevention is.

*Ute Indian Tribe* and *White Mountain Apache* are also instructive here.  Again, these cases made clear that when the Federal Government has a fiduciary relationship to an asset held in trust and has comprehensive fiduciary duties to that asset, it is a reasonable inference that "the Government is subject to duties as a trustee to protect and preserve the property."  *Ute Indian Tribe,* 99 F.4th at 1368 (cleaned up).  And, moreover, it is a "commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch." *White Mountain Apache Tribe,* 537 U.S. at 475 (cleaned up).  As discussed above, the broad fiduciary relationship established by 25 U.S.C. §§ 406, 407, and 5109 requires the Government "to protect and preserve" Indian forest lands, and thereby conduct fire prevention activities. Similarly, the court finds that the duty to preserve Indian forest lands includes the duty to rehabilitate the forest after fire.  Without regular regeneration and rehabilitation of the forest after disasters like fires, the Government would not be preserving the forest, but allowing the forest to become unproductive and essentially "fall into ruin."

NIFRMA explains that the management of these fiduciary duties includes "assessment of damage" after fires.  25 U.S.C. § 3103(4)(F).  And NIFRMA makes clear that management of the forests includes the use of "silvicultural treatments to restore or increase growth" and yield the forest's "full productive capacity . . . ."  *Id.* at § 3103(4)(C).  In conjunction with 25 U.S.C. §§ 406, 407, and 5109, these clarifying provisions show that forest rehabilitation is a necessary part of the Government's forest management.  The forest is certainly not at its full productive capacity if it has burned to the ground.  Moreover, the duty to ensure the forests stay in productive state, and thus continually rehabilitate the forests, predated NIFRMA and was historically considered encompassed in the duty to manage the forest in accordance with the principles of sustained yield.

The 1911 Regulations illustrate the Government's duties to ensure perpetual timber reproduction. As stated in prior sections, 1911 Regs. § 2 instructs forest officers to "thoroughly familiarize themselves with all phases of forestry work on the reservations to which they are assigned, including a knowledge of . . . the total stand of timber, of the relative quantity, rapidity of growth, seeding qualities, character of reproduction, adaptability to location, etc., of the different species found." Sections 28 and 29 likewise prescribe duties to ensure the forest remains regenerative even during natural disasters like fires. 1911 Regs. § 28 ("Ordinarily the brush should be piled at the time of cutting and burned . . . . Where there is a special danger of soil erosion, or where on a steep slope or in a dry locality a soil covering is needed to insure *reproduction*, the brush may be scattered."); 1911 Regs. § 29 ("If there is danger that fire will run over the cutting area, enough trees should be left to seed the ground fully even though reproduction is present at the time of the cutting. To give good results, seed trees of most species should not be farther apart than twice their height, and should be evenly distributed over the cutting area . . . .").

The 1966 Regulations demonstrate the Government's duty to maintain the forest in a perpetually productive state as well. 25 C.F.R. § 141.3(a) (1966) articulates:

> The following objectives are to be sought in the management of unallotted Indian forest lands in accordance with the principles of sustained yield: (1) The *preservation of such lands in a perpetually productive state* by providing effective protection, by applying sound silvicultural and economic principles to the harvesting of the timber, and *by making adequate provision for new forest growth as the timber is removed*. . . . . (6) The management of the forest in such a manner as to retain its beneficial effects in regulating water run-off and minimizing erosion. (7) The preservation and development of grazing, wildlife, and other values of the forest to the extent that such action is in the best interest of the Indians.

(emphasis added). This section shows that "preservation of the lands in a perpetually productive state" is part of managing the forest in accordance with the principles of sustained yield as well as prescribes the rehabilitative duty to make "adequate provision for new forest growth as the timber is removed . . . ." *Id.*

The 1982 and 1984 Regulations likewise show that part of managing the forest in accordance with the principles of sustained yield includes forest regeneration and making adequate provision for new growth. Both set out almost identical prescriptions. The 1982 Regulations state:

> (a) The following objectives are to be sought in the management of unallotted Indian forest lands in accordance with the principles of sustained yield: (1) The preservation of such lands in a *perpetually productive state by providing effective protection*, by applying sound silvicultural and economic principles to the harvesting of the timber, *and by making adequate provision for new forest growth as the timber is removed* . . . . (6) The management of the forest in

such a manner as to retain its beneficial effects in regulating water runoff and minimizing erosion. (7) The preservation and development of grazing, wildlife, and other values of the forest to the extent that such action is in the best interest of the Indians.

25 C.F.R. § 163.3(a) (1982) (emphasis added).  And the 1984 Regulations state:

> The following objectives apply to the management of Indian forest lands.  (a) The *development, maintenance and enhancement of commercial forest lands in perpetually productive state* by providing effective management and protection through *the application of sound silvicultural and economic principles to the reforestation, growth* and harvesting of timber and other forest products. *This includes making adequate provision for new forest growth as the timber is removed . . . .* (g) The management and protection of forest resources to retain the beneficial effects of regulating water runoff and minimizing soil erosion.  (h) The management and protection of forest lands to maintain and/or improve timber production, soil productivity, grazing, wildlife, fisheries, recreation, aesthetic, cultural, and other traditional values of the forest to the extent that such action is in the best interest of the Indians.

25 C.F.R. § 163.3 (1984) (emphasis added).  As with the 1966 Regulations, both the 1982 and 1984 Regulations indicate that ensuring the forest lands are perpetually productive is an essential part of the Government's duty to manage Indian forest lands.  Further, the 1984 Regulations order that a reasonable deduction be withheld to cover the cost of forest management which includes forest regeneration.  25 C.F.R. § 163.18 (1984) ("In sales of forest products from Indian forest lands, a reasonable deduction shall be made from the gross proceeds to cover in whole or in part the cost of managing and protecting the forest lands.  Such costs will include the cost of sale administration, and forest regeneration.").

NIFRMA adopts similar language used in these prior regulations in its instruction to regulate water runoff and minimize erosion.  25 U.S.C. § 3104(b)(6) (instructing that forest land management shall be designed to achieve "the management and protection of forest resources to retain the beneficial effects to Indian forest lands of regulating water run-off and minimizing soil erosion.").  And again, the "application of sound silvicultural and economic principles" to ensure forest growth language used in these prior regulations is also mirrored in NIFRMA's prescription to "use of silvicultural treatments to restore or increase growth."  25 U.S.C. § 3103(4)(C).  Indeed, NIFRMA codifies and clarifies the already present duty to continually regenerate the forest so that it remains in a perpetually productive state.

In conclusion, 25 U.S.C. §§ 406, 407, and 5109, their regulations, and NIFRMA clearly require the Government to rehabilitate Indian forest lands after fire and keep the forest in a perpetually productive state.  Thus, given the statutory language and the analysis above concerning 25 U.S.C. §§ 406, 407, and 5109, Plaintiff has demonstrated that these sources of law satisfy step one of the *Navajo II* test for the rehabilitation duty.

> d)     *Plaintiff alleges a breach of a fiduciary duty to adequately*
> *maintain roads on the Indian forest land within the Colville Reservation.*

The Plaintiff also alleges the Government breached its fiduciary duty "to perform necessary road maintenance on forest roads . . . ." ECF No. 1 at ¶ 79; *see id.* ¶¶ 80-84. Plaintiff argues this duty stems from NIFRMA, 25 U.S.C. §§ 3103(4)(J), 3104(b)(6), and 3104(b)(7) and 25 U.S.C. §§ 406, 407, 5109, § 318a. ECF No. 11 at 17-18. NIFRMA 25 U.S.C. § 3103(4)(J) calls for the "improvement and maintenance of extended season primary and secondary Indian forest land road systems . . . ." And 25 U.S.C. § 3104(b)(6)-(7) directs "the management and protection of forest resources to retain the beneficial effects to Indian forest lands of regulating water run-off and minimizing soil erosion; . . . and the maintenance and improvement of timber productivity, grazing, wildlife, fisheries, recreation, aesthetic, cultural and other traditional values . . . ." The Plaintiff contends "[p]roper maintenance is a key aspect of protection of water resources from runoff, 25 U.S.C. § 3104(b)(6) and the protection of fisheries and cultural resources, 25 U.S.C. § 3104(b)(7)." ECF No. 11 at 17-18. Further, according to the Plaintiff, 25 U.S.C. § 406 "requires Secretarial approval of timber sales, which necessitate roads," and 25 U.S.C. §§ 407 and § 5109 "direct[] that the Secretary shall carry out sustained yield management, which also necessitate functional forest roads . . . ." *Id.* at 17. Plaintiff also asserts 25 U.S.C. § 318a "authorizes appropriations for roads." *Id.*; *see also* 25 U.S.C. § 318a ("Appropriations are hereby authorized out of any money in the Treasury not otherwise appropriated for material, equipment, supervision . . . in the survey, improvement, construction, and maintenance of Indian reservation roads . . . ." ).

Like with the prior duties analyzed above, the duty to maintain Indian forest roads predated NIFRMA and is encompassed in the comprehensive fiduciary duties to preserve and protect Indian forest lands established by 25 U.S.C. §§ 406, 407, 5109, and their regulations. Admittedly, there are greater factual questions surrounding the roads duty compared to the other duties. But one of the *Mitchell* cases dealt squarely with the duties surrounding roads. The Court of Claims decision between *Mitchell I* and *Mitchell II* (the decision affirmed by *Mitchell II*) examined "25 U.S.C. §§ 318a, 323-325 (roads and rights-of-way)" along with 25 U.S.C. §§ 406, 407, and 5109. *Mitchell v. United States*, 664 F.2d 265, 272 (Ct. Cl. 1981), *aff'd and remanded*, 463 U.S. 206 (1983). And the court found "[i]t cannot be that Congress intended no payment at all for rights-of-way incorrectly granted by Interior without proper authority. Moreover, *when read in pari materia with the other forest control statutes* (just discussed), these right-of-way provisions authorize compensation for loss of income or property value occasioned by Interior's unjustified failure or refusal to build or maintain the roads called for by proper harvesting and forest care." *Id.* at 273 (emphasis added). This decision stands and binds this court. And according to this decision, a duty to "to build or maintain the roads called for by proper harvesting and forest care" is encompassed in 25 U.S.C. § 318a and 25 U.S.C. §§ 406, 407, and 5109. *Id.*

Thus, just as proper forest management and maintenance includes preventing the forest from burning down, proper forest management also requires maintenance of roads as shown by *Mitchell*, 664 F.2d at 273. This is once again akin to *Ute Indian Tribe*. In *Ute Indian Tribe*, where the Government took on construction of the Tribe's irrigation systems, the Federal Circuit held the Government had fiduciary duties to maintain and "preserve" these systems. *Ute Indian Tribe,* 99 F.4th at 1368. Likewise, here the Government has taken on the obligation to construct

roads in accordance with its fiduciary duties to the forest and must maintain and "preserve" these roads. *Id.* Therefore, NIFRMA's prescription that the Government maintain roads is reinforcing the pre-existing duty to build and maintain roads, as recognized in *Mitchell*, 664 F.2d at 273.

The court cannot accept the Government's assertion that "because the forest roads at issue in this case are not alleged to be BIA-owned or Tribally-owned 'public roads,' 25 U.S.C. § 318a is inapplicable to this case." ECF No. 7 at 24. For the purposes of the motion to dismiss, the court makes all reasonable inferences in favor of the Plaintiff. Here it makes the inference that the forest roads are BIA or tribally owned. *Trusted Integration, Inc.*, 659 F.3d at 1163; *see also* RCFC 8. Whether these roads are in fact BIA or tribally owned is an issue that can be addressed at the summary judgment stage with an evidentiary record. But for now, the court finds the Plaintiff has sufficiently pled a fiduciary duty and satisfied *Navajo II* step one for this road maintenance duty.

### B. *Navajo II* step two.

The Government additionally asserts that Plaintiff's asserted sources of law do not satisfy step two of the *Navajo II* test because they are not money-mandating. ECF No. 7 at 1 ("Plaintiff fails to identify a money-mandating duty that would support an award of damages."); ECF No. 7 at 18 ("even if Plaintiff could clear the first hurdle of identifying specific fiduciary duties, it cannot clear the second hurdle and prove that Congress intended for [the] duties [set forth in NIFRMA] to be money-mandating.").

To the contrary, the sources of law Plaintiff identified, NIFRMA, 25 U.S.C §§ 406, 407, and 5109, and the implementing regulations, are quite clearly money-mandating. The court again finds the Supreme Court's holding in *Mitchell II* to be on point. There, the Court explained:

> Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.

*Mitchell II*, 463 U.S. at 226; s*ee also Hopi Tribe*, 782 F.3d at 668 ("It is well established that a trustee is accountable in damages for breaches of trust."). The Supreme Court's analysis in *Mitchell II* applies in the same way here. Because 25 U.S.C. §§ 406, 407, and 5109, both on their own and with NIFRMA's instructions, "clearly establish fiduciary obligations" of the Government to manage fuels and conduct adequate tree thinning, fire prevention, forest rehabilitation, and road maintenance on Indian forest lands, the breach of these duties "can be fairly interpreted as mandating compensation" for damages. *Mitchell II*, 463 U.S. at 226. Given the existence of the trust relationship between the Government and Indian forest lands, it follows that the Government should be liable for breach of its fiduciary duties to these lands and their beneficiaries. Moreover, the Government has been withholding deductions from Indian timber sales to "to cover *in whole or part the cost of managing and protecting such Indian forest land*."

25 U.S.C. § 3105(a) (emphasis added).  This surely indicates as well that the statutes instructing the management and protection of Indian forest land can be fairly interpreted as mandating compensation.

The sources of law identified by the Plaintiff for the breaches that satisfy step one, also satisfy step two of the *Navajo II* test and thus establish jurisdiction under the Indian Tucker Act.

### C.     *Navajo III* does not alter this court's analysis or holding.

In its supplemental briefing, the Plaintiff maintains *Arizona v. Navajo Nation*, 599 U.S. 555 (2023) (*Navajo III*) does not impact this case or obviate any of the fiduciary duties alleged. ECF No. 20.  The Government counters *Navajo III* "reinforces the proposition that Plaintiff must identify specific rights-creating and duty-imposing language in statutes and regulations in order to have a viable breach of trust claim"—and that it "bears on, and is fatal to, Plaintiff's claims" because it 1) "undercuts Plaintiff's reliance" on the *Mitchell* cases to establish a source of fiduciary duty, and 2) "undercuts Plaintiff's argument that . . . NIFRMA . . . can serve as the basis for enforceable trust duties."  ECF No. 19 at 2, 4.

*Navajo III* concerned the issue of whether the 1868 Treaty between the United States and Navajo Nation created a judicially enforceable fiduciary duty to take affirmative steps to secure water for the Navajo tribe—which Navajo Nation claimed it did.  *Navajo III*, 599 U.S. at 558.  To resolve this issue, the Court articulated the well-established standard that: "[t]he Federal Government owes judicially enforceable duties to a tribe only to the extent it expressly accepts those responsibilities. Whether the Government has expressly accepted such obligations must train on specific rights-creating or duty-imposing language in a treaty, statute, or regulation." *Id.* at 564 (cleaned up).  And utilizing this standard, the Court examined the 1868 Treaty and found it "contained no rights-creating or duty-imposing language that imposed a duty on the United States to take affirmative steps to secure water for the Tribe." *Id.* (cleaned up).  The Court also found the alleged duty could not be inferred—explaining that "*unless Congress has created a conventional trust relationship with a tribe as to a particular trust asset*, this Court will not apply common-law trust principles to infer duties not found in the text of a treaty, statute, or regulation." *Id.* at 565–66 (cleaned up) (emphasis added).  The Court concluded that "nothing in the 1868 treaty establishes a conventional trust relationship with respect to water." *Id.* at 566.

*Navajo III* does not alter this court's holding on the Government's fiduciary duties. Indeed, the standard remains the same.  Like the Supreme Court in *Navajo III*, the court here applied that same analytical standard to determine whether a fiduciary duty to the tribe existed. *Id.* at 563–64 ("Whether the Government has expressly accepted such obligations must train on specific rights-creating or duty-imposing language in a treaty, statute, or regulation.") (cleaned up).  Although the Supreme Court did not find an affirmative trust duty for the Government in *Navajo III*, as the Plaintiff highlights: "the case turned on a different law which lacked express rights-creating language and a much different set of facts."  ECF No. 20 at 6.  *See Navajo III*, 599 U.S. at 564–70.  And unlike the 1868 Treaty at issue in *Navajo III*, which "contained no rights-creating or duty-imposing language that imposed a duty on the United States . . . " *id.* at 564 (cleaned up), 25 U.S.C. §§ 406, 407, and 5109, along with their regulations and NIFRMA, mandate the Government perform the specific forest management and fire prevention duties that the Government allegedly breached in this case.  Indeed, the statutes the Plaintiff relies on in this

case have everything the Supreme Court found lacking in the 1868 Treaty.  Thus, rather than undercut Plaintiff's arguments, *Navajo III*, if anything bolsters Plaintiff's case.

The Government's arguments concerning *Mitchell II* and NIFRMA are therefore unavailing.  Like the Supreme Court, this court found no duties arising from a general trust duty alone, or the *Mitchell* cases themselves.  Rather, this court found duties arising from the statutes and regulations analyzed in *Mitchell II*.  Thus, nothing in *Navajo III* or the parties' supplemental briefing requires this court to change its analysis.

### D.    Plaintiff's claims accruing within six years of the complaint are not barred by the statute of limitations.

In this court, unless a different period is specified by statute, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.  "Compliance with the [United States Court of Federal Claims]'s statute of limitations is jurisdictional."  *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986).  And "statutes of limitations are to be applied against the claims of Indian tribes in the same manner as against any other litigant . . . ." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576 (Fed. Cir. 1988).  In the context of claims for breaches of fiduciary duty, "[a] cause of action for breach of trust traditionally accrues when the trustee repudiates the trust and the beneficiary . . . knew or should have known of the breach."  *Birdbear v. United States*, 162 Fed. Cl. 225, 242 (2022) (cleaned up).  Although "a claim does not accrue until the claimant has suffered damages," *Rosebud Sioux Tribe v. United States*, 75 Fed. Cl. 15, 24 (2007) (cleaned up), the filing of a lawsuit cannot be postponed until the extent of the damage is known.  *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1354 (Fed. Cir. 2011).  And accrual starts at the time the defendant acts, not the time at which the consequences of the act become most painful.  *Navajo Nation v. United States*, 631 F.3d 1268, 1277 (Fed. Cir. 2011).

The Government argues that even if Plaintiff identified a money-mandating duty, some of Plaintiff's claims should be dismissed because they accrued before August 4, 2015, and are thereby barred by the six-year statute of limitations.  ECF No. 7 at 27-35; ECF No. 14 at 12.  Specifically, the Government asserts "three of the alleged breaches of trust set forth in the Complaint relate to forest and fire management that occurred prior to the fires" and that "[a]s a result, these claims [of breach of the fuels management, road maintenance, and fire prevention duties] are barred by the statute of limitations."  ECF No. 7 at 29-30; *see also* ECF No. 14 at 13 ("Plaintiff's claims for alleged breaches of trust relating to fuels management, forest road maintenance, and fire prevention all accrued when Plaintiff had knowledge of the alleged mismanagement . . . years before the fires occurred.").  The essential question, therefore, is when the Government allegedly breached its fiduciary duties and the Plaintiff "knew or should have known of the breach."  *Birdbear*, 162 Fed. Cl. at 242 (cleaned up).  Plaintiff argues "the Colville Tribes' claims did not accrue until the first of those fires (the North Star Fire) started on August 13, 2015, because the damages from that fire and subsequent fires on the Reservation that are part of this lawsuit did not occur until then."  ECF No. 11 at 28.

There are certainly breaches that the Plaintiff was well aware of before it filed this case.  For instance, the breaches that were detailed in the IFMAT I, II, and III reports were known to

the tribe no later than the publication of these reports in 1993, 2003, and 2013, and claims based on them accrued at those times.  Such claims are barred by the statute of limitations.  But that does not mean that the court can dismiss the fuels management, fire prevention, or road maintenance claims for two reasons.

First, while there may be some portion of the alleged breaches of road maintenance that predated the fires, not all of them do.  Plaintiff alleges that "[a]fter the fires were finally out, the United States failed to take the required measures to restore roads" and that "[f]ollowing the fires, inadequately maintained roads contributed to severe resource damage, including to water quality, soils, and fisheries."  ECF No. 1 ¶ 2, 84.  The complaint also states "[f]ollowing the devastating North Star and Tunk Block fires, the United States failed to ensure the return of the Tribes' forests to a productive state.  The United States failed to restore damaged roads, control soil erosion, conduct mulching and seeding, clean and repair culverts . . . ."  ECF No. 1 ¶ 98-99.  Plaintiff plausibly alleges that the 2015 fires damaged the roads, and that the Government breached its duty to maintain and restore the roads after the 2015 fires.  Thus, these alleged breaches occurred within the statute of limitations.  As to alleged breaches that predated the 2015 fires, the court does not yet have sufficient facts before it to know when the Plaintiff knew or should have known about the alleged breaches.

The Plaintiff's complaint also alleges that breaches of the fuels management and fire prevention duties occurred within the statute of limitations.  Plaintiff is not only claiming the Government breached its fuels management and fire prevention duties in respect to the 2015 North Star and Tunk Block fires, but also in respect to other fires that have occurred since the 2015 fires.  In its complaint, Plaintiff alleges:

> Since the North Star and Tunk Block fires, there have been additional high intensity fires on the Colville Reservation that have further damaged the land's resources, including the Cold Creek Fire, Bridge Creek Fire and other fires, including fires burning at time of the filing of this complaint.  The United States' breaches of trust caused damages suffered by the Colville Tribes from these fires and greatly increases the opportunity for more large-scale devastating fires in the near future.

ECF No. 1 ¶ 59; *see also id.* ¶ 5 ("Since the North Star and Tunk Block wildfires, wildfires have continued to occur on the Reservation.  The Tribes are contending with major fires at the time of the filing of this Complaint. In the summer of 2021, more than 60,000 acres have already burned, before the typical height of fire season.").  Indeed, Plaintiff asserts that the Government failed to conduct its forest health and fire prevention duties with respect to these subsequent other fires— thus, these alleged breaches also occurred within the statute of limitations. *Id.* ¶ 78 ("The United States' breaches of trust relating to forest health caused the forests on the Reservation to pose an extreme fire risk, and increased the size, severity, and damage caused by the North Star, Tunk Block, and *other fires*."); *id.* ¶ 89 ("The United States' breaches of trust relating to fire prevention increased the size, severity, and damage caused by the North Star, Tunk Block, and *other fires*.") (emphasis added).  And as Plaintiff emphasizes "[t]he United States' Motion fails to acknowledge that the Tribes' Complaint covers the North Star and Tunk Block fires, but also

the subsequent major fires that occurred on the Reservation . . . ." ECF No. 11 at 3.[7] Thus, there is no statute of limitation issue with any of these claims insofar as they allege breaches accruing within the statute of limitations.

Second, the duties that the Plaintiff alleges the Government breached are continuing in nature, meaning that the Plaintiff can recover for breaches accruing within the statute of limitations. The continuing claim doctrine applies when the plaintiff's claims can "be broken down into a series of independent and distinct wrongs or events, each such wrong or event having its own associated damages" and "[e]ach wrong constituted an alleged violation of a statute or regulation that accrued when that particular wrong occurred, independent of the accrual of other wrongs." *Brown Park Ests.-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1457 (Fed. Cir. 1997). The doctrine "operates to save later arising claims even if the statute of limitations has lapsed for earlier events." *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998). Therefore, if separate breaches of the Government's trust duties occurred during the six years prior to the filing of the complaint—as the Plaintiff alleges here— these breaches are actionable under the continuing claim doctrine. "The rationale underlying the 'continuing claim' doctrine, . . . is that it prevents the defendant from escaping all liability for its wrong and thus 'acquiring a right' to continue its wrongdoing . . . ." *Hopland Band of Pomo Indians*, 855 F.2d at 1581.

Even if the Government was failing to comply with its duties to manage the fire load or properly thin the forest at some time in the past (e.g., when IFMAT I was issued), that does not dictate that any such claim of mismanagement is untimely. Indeed, the Government must constantly update the management plans and reallocate resources as conditions change. *E.g.*, 25 C.F.R. § 163.11(a) (dictates that "an appropriate forest management plan shall be prepared *and revised as needed* for all Indian forest lands.") (emphasis added). The duties to protect the forest discussed above likewise are continuing in nature. "Under statutes, regulations, and forest management plans, the government clearly had a continuing duty to manage plaintiff's timber resources. Managing the forest lands included protecting, harvesting and selling the timber, reforestation, and administrating all aspects of the program. These duties are not isolated projects, but rather are year-in and year-out, continuing responsibilities." *Apache Tribe of Mescalero Rsrv. v. United States*, 43 Fed. Cl. 155, 171 (1999). And in *Mitchell v. United States*, 10 Cl. Ct. 787, 788 (1986), *decision supplemented*, 13 Cl. Ct. 474 (1987), the court held that under the continuing claims doctrine the plaintiff could sue for damages stemming from the Government's breaches of its continuing duty to regenerate the forest. The court explained "the existence of a continuing duty to regenerate means that on each day the BIA failed in its duty to regenerate a given stand, there arose a new cause of action" and "if the BIA allowed a particular

---

[7] Although the Government acknowledges that Plaintiff identifies certain post-2015 fires by name, it claims it is unclear what fires are the subject of this litigation. ECF No. 14 at 16 n.3. The Government additionally asserts that if Plaintiff's claims survive this motion, it should provide a more definite statement of all the fires at issue in this case. *Id.* Under RCFC 8, however, Plaintiff is only required to file a short and plain statement of its claim. Here, Plaintiff satisfies that requirement in reference to its claims relating to the post-2015 fires at the Colville Reservation. To the extent the Government wants Plaintiff to specifically identify each fire at issue, that is an issue well-suited for discovery.

tract to remain unproductive for decades, . . . plaintiffs can sue for damages stemming from those breaches which occurred in the six years immediately preceding the filing of suit." *Id.*

Indeed, 25 U.S.C. §§ 406, 407, and 5109, their regulations, and NIFRMA require the Government to perform ongoing fiduciary duties to Indian forest lands including ongoing duties to manage fuels, engage in fire prevention, and maintain forest roads. Accordingly, each instance that the Government breaches these duties is an "independent and distinct wrong" that constitutes "an alleged violation of a statute or regulation that accrued when that particular wrong occurred . . . ." *Brown Park Ests.-Fairfield Dev. Co.*, 127 F.3d at 1457. Because Plaintiff plausibly alleges that independent and distinct breaches of these duties accrued in August 2015 and afterwards (i.e., within the statute of limitations), the fact that the Government may have breached its duties prior to August 2015 does not necessarily preclude Plaintiff's claims for breaches in and after 2015. Therefore, the court cannot dismiss these claims on statute of limitations grounds on the record before the court at this stage.

What record is before the court also indicates that fuel management projects were happening in greater numbers at the Colville Reservation in the years leading up to the 2015 fires. In the areas around the community of Nespelum and along Highway 155, the Government was managing the fuel load. ECF No. 7-2 at 11-12. As it turns out, these treatments appear to have been successful: "[t]hinning and broadcast burning reduced overall fuel loading. The resultant reduced fire behavior made it safer for firefighters" and "[a]long the Highway 155 Treatment area, the fire treatments significantly lengthened the distance necessary for fire to spot across. When the approaching fire hit the treated area, fewer firefighters were needed to hold the fire. With firefighters already in short supply, this was a key success." *Id.* at 12. As the various reports the Government points to make clear, the Government regularly updates its management plans regarding the various forests. The Government updates its plans based on changes to the fire risk facing the Plaintiff. Indeed, the management plan for the Colville Reservation was in the process of being updated in 2015. *See* ECF No. 7-6 (2015 IRMP). The Government also reported a significant upswing in fire protection projects on reservations nationwide, which more than doubled from 17,044 projects in 2014 to 37,263 projects in 2015. ECF No. 7-3 at 24. Given the frequent updates and changes that the Government makes in forest management, it is unclear whether the supposed past mismanagement would put Plaintiff on sufficient notice so that it "knew or should have known of the [Government's] breach[es]." *Birdbear*, 162 Fed. Cl. at 242 (cleaned up). In the end, the continuing nature of the Government's duties means that past failures to comply with its duties do not immunize it from liability forever. While further factual development may show Plaintiff should have been aware of the alleged mismanagement before the 2015 fires, at this stage in the litigation it is too early to determine the extent to which Plaintiff was aware the Government breached its fuels management, fire prevention, and road maintenance duties prior to 2015.

Furthermore, it is unclear whether any of the alleged fire prevention breaches relating to the 2015 fires are barred by the statute of limitations. For example, Plaintiff asserts "[t]he United States did not maintain an adequate level of readiness to meet normal wildfire protection needs and extinguish forest or range fires on the Colville Reservation, and did not provide adequate staff and labor for fire prevention." ECF No. 1 ¶ 88. Given that there is a regular cycle of assessments and reallocation of resources based on changing conditions, it is not clear when the Plaintiff knew or should have known of this alleged breach.

It is true, as the Government argues, that "the cumulative effect of alleged breaches by the Government that [are] outside of the six-year statute of limitations period" do not represent continuing claims. *Goodeagle v. United States*, 111 Fed. Cl. 716, 724 (2013). But this court does not have enough before it to conclusively state that Plaintiff is seeking to recover for the cumulative effect of prior breaches rather than new breaches. The Plaintiff explains that the continuing claims doctrine applies here because "each of the . . . claims can be broken into a series of independent and distinct wrongs, such as the failure to thin trees, create a fire break, hire personnel, or provide fire-fighting equipment," and these alleged wrongs are ongoing and occurred within the statute of limitations. ECF No. 11 at 34-35. In short, if the evidence shows that the Plaintiff's claims seek to recover for the cumulative effects of old breaches (e.g., the breaches outlined in IFMAT I), then the court can grant judgment accordingly. But the court cannot dismiss this action now based on the limited, pre-discovery record.

Nor is there enough in the record at this point to conclude that the Plaintiff was so involved in the management of the forest that it knew of the Government's prior breaches alleged in this case. Indeed, there is nothing yet before the court detailing the Plaintiff's direct involvement, and the court cannot agree that some unspecified involvement, which is not pled in the complaint, is enough to bar Plaintiff's fuels management, fire prevention, and road maintenance claims. The Government also contends that the Plaintiff knew or should have known of the alleged breaches in real time due to its involvement in the forestry management. Again, the court cannot definitively make that conclusion based on the record at this stage.

Thus, the court only grants the motion to dismiss on statutes of limitations grounds insofar as it seeks to dismiss Plaintiff's claims that accrued more than six years before the filing of its complaint. What these claims are at this stage is unclear. Therefore, the court cannot dismiss all Plaintiff's fuels management, fire prevention, or road maintenance claims as the Government requests.

## II.    The settlement agreement bars some claims.

Finally, the Government moves to dismiss the complaint under RCFC 12(b)(6), arguing that the Plaintiff released the claims it now brings to this court. When evaluating a RCFC 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court assumes the truth of the complaint's well-pleaded factual allegations and draws all reasonable inferences "that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Based on these allegations, the court "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Twombly*, 550 U.S. at 555 (internal citation omitted).

The Government asserts that a "complaint may also be dismissed under Rule 12(b)(6) when existence of an affirmative defense bars the award of any remedy." ECF No. 7 at 11 (cleaned up). According to the Government, "Plaintiff waived and released in a prior settlement any claims of harm associated with forest mismanagement that occurred prior to May 2012." *Id.*

at 36.  Under the Government's theory, "to the extent the Complaint includes claims regarding the United States' alleged breaches of trust relating to fuels management, thinning, forest road maintenance, and fire prevention accrued prior to May 16, 2012,[8] those claims are barred by the doctrines of waiver and release and must be dismissed."  *Id.* at 37–38.

Because this argument requires the interpretation of a settlement agreement, the court begins with the text of the agreement:

> Plaintiff hereby waives, releases, and covenants not to sue in any administrative or judicial forum on any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory for any damages . . . that are based on harms or violations occurring before the date of this Court's entry of this Joint Stipulation of Settlement as an Order and that relate to Defendants' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary trust assets or resources.

ECF No. 7-5 ¶ 4.  Among the claims being released was that the Government mismanaged the non-monetary trust assets, including the "fail[ure] to preserve, protect, safeguard, or maintain Plaintiff's non-monetary trust assets or resources."  *Id.* ¶ 4(b)(4).  The agreement did not release subsequent claims for harms or damages—it provided that "[n]otwithstanding . . . Paragraph 4 above, nothing in this Joint Stipulation of Settlement shall diminish or otherwise affect in any way Plaintiff's ability, subject to the provisions of Paragraph 13 below, to assert a claim for harms or damages allegedly caused by Defendants after the Court's entry of this . . . Settlement . . . ."  *Id.* ¶ 6(a).

This language is clear, and the court will adhere to it.  In short, the agreement releases all claims that the Plaintiff knew or did not know about on May 16, 2012 "that are based on harms *or violations* occurring before" the entry of the agreement.  *Id.* ¶ 4 (emphasis added).  Because this is phrased in the disjunctive, it applies to any violation that had occurred whether there was any harm at the time of the settlement.  Therefore, the court agrees that any alleged breaches of the Government's trust obligations prior to May 16, 2012, that are covered by the settlement agreement, are barred by the release regardless of whether there was any harm at the time.

That said, at this stage of the litigation the court cannot determine how broad this release will turn out to be.  As explained above, the Government was constantly updating its management of the forest (or if it failed to do so that failure could also constitute a breach of the duties at issue here).  Such management choices after 2012 are clearly not impacted by the settlement agreement.  To the extent that the parties dispute whether harms were caused by released trust management duties or subsequent acts (or failures to act), that will require a fully developed factual record (and perhaps expert testimony) that is not yet before the court.

---

[8] The settlement agreement took effect on May 16, 2012, which is the date on which the district court approved it.

Therefore, the court grants the motion to dismiss insofar as it seeks to dismiss claims based on violations of the Government's trust duties that occurred on or before May 16, 2012, with the caveat that the determination of what is actually released will require a fully developed record that is not yet before the court.

**III.    Conclusion.**

For the foregoing reasons, the court grants-in-part and denies-in-part the Government's motion to dismiss, ECF No. 7.

It is so ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge